**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS R. BUSS,** | : | **Civil No. 1:21-CV-00139** |
| | : | |
| **Plaintiffs,** | : | |
| | : | **(Judge Wilson)** |
| **v.** | : | |
| | : | |
| **PENSKE LOGISTICS LLC,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.   Introduction

Pending before the court is a motion for summary judgment filed by the defendant, Penske Logistics LLC ("Penske"). (Doc. 72). The plaintiff, Thomas R. Buss ("Buss"), a former employee of Penske, filed this action against Penske alleging discrimination and retaliation under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA") (Doc. 1).

Penske has now filed a motion for summary judgment, contending that Buss' claims fail as a matter of law. This motion is fully briefed and is ripe for resolution. (Docs. 73-74, 76-80). After consideration, we conclude that there are no genuine disputes of material fact with respect to Buss' claims. Accordingly, we will recommend that the motion for summary judgement be granted as to all counts.

II.    **Statement of Facts and of the Case**[1]

Buss was hired by Penske in 2015 to work as a CDL (commercial driver's license) truck driver. Buss worked specifically on the account of Buckeye All Size Corrugated ("BCI"), a customer of Penske located in Columbia, Pennsylvania. One of Buss' job duties was to drive a Penske truck hauling corrugated products to BCI's customers.

Prior to being employed with Penske, Buss was diagnosed with an anxiety disorder in 2005 and was diagnosed with attention deficit disorder ("ADD") in 2011. In 2015, seven months after starting work with Penske, Buss was diagnosed with a mood disorder and ADD. Since 2015, Buss has taken the following medically prescribed drugs: Ritalin, dexamphetamine, Concerta, Lamotrigine, Xanax, Knlonopin, Clonozepen, Vicodin, and Hydrocodone.

In August 2015, Buss was granted a leave of absence for a hemorrhoid problem. In October 2015, Buss requested a second leave of absence. At this time, Buss informed a representative of Prudential that his leave of absence was for substance abuse treatment. (Doc. 73-1, at 33). Prudential was third-party administrator Penske utilized at the time to manage its review processes for employee leave of absence requests. Buss also testified that he advised the

---

[1] The factual background of this Report and Recommendation is taken from the parties' submissions to the extent they are consistent with the evidence in the record. (Docs. 72-74, 76-80).

representative of Prudential that he did not want his immediate supervisors to know that the reason for his leave of absence was to seek substance abuse treatment. (Id.) On November 4, 2015, while Buss was on leave in a drug treatment program, Buss had a phone call with Joel Seeger, who Buss reported directly to at Penske. At this point all that was known concerning his leave of absence was that it was for "personal reasons." (Id., at 32). Buss testified during the phone call that he told Seeger the following: " 'I want to let you know where I am. Uhm, I'm at Retreat in Ephrata, Pennsylvania, and I'm here to take care of something that I've been, you know, wanting to take care of. And, you know, it's mental health related.' " (Id., at 33). Additionally, Buss testified that he did not recall telling Seeger he was receiving substance abuse treatment and when Buss returned to work after this leave of absence, he did not inform anyone of the specific nature of the reason why he took a leave. (Id., at 34, 39).

Eighteen months later, in May 2017 Penske announced it would launch a new safety initiative that would involve the installation of inward and outward facing cameras made by SmartDrive in its trucks. These cameras would record when triggered by harsh turns or brakes, excessive speeds, collisions, and the like. Buss was introduced to this new initiative, the SmartDrive program, at a presentation on April 18, 2018. After hearing about the SmartDrive system, Buss contacted Penske's Area Human Resources Manager, Barbara Miletics. Buss explained to Miletics that

the SmartDrive system would create significant anxiety for him. Accordingly, Buss requested an accommodation to not have an inward-facing camera in the cab of the truck he would be expected to operate. Buss requested this accommodation on April 19, 2018. The SmartDrive cameras were scheduled to be installed May 2, 2018. Buss was put on leave following his accommodation request.

After Buss made this request, his doctor Leopold Vocalan, M.D., sent a letter to Penske stating: "[Buss] is diagnosed to have Unspecified Anxiety Disorder. While his anxiety is currently under control with medication, increased surveillance such as use of inward facing cameras can exacerbate his anxiety and appropriate accommodation would be medically necessary." (Id., at 170). Penske requested additional information from Dr. Vocalan, but Penske found the additional information regarding Buss' medical condition insufficient, so Penske ordered an independent medical examination.

On June 6, 2018, Dr. Janofsky conducted an independent medical examination of Buss. Prior to the examination, on June 1, 2018, Penske sent Buss a letter requesting that Buss send certain medical records to Dr. Janofsky.  On June 13, 2018, Dr. Janofsky provided Penske with his report, which described Buss' prescription drug use to treat his alleged disabilities including, Ritalin, Xanax, Concerta, methylphenidate, and other drugs. Buss' admission to attending an in-person substance use disorder rehabilitation program in 2015 was also documented in this

report. Buss' prescription drug use and past substance abuse treatment was not previously disclosed to Penske.

Buss' employment with Penske was then terminated because according to Penske, Buss violated its Drug and Alcohol Policy by failing to disclose DOT-disqualifying drugs and past substance abuse treatment. Buss disputes Penske's reason and asserts it was not actually reason for the termination of his employment. Penske's termination action form stated the following reasons for Buss' termination:

> During your recent medical examination we learned about the amount of drugs you are/were taking and required to report to us, but did not. Failure to report is a terminable offense and a violation of our drug and alcohol policy. In addition, we learned that you entered rehab for drug and alcohol use during your employment and did not disclose this to us either. In fact, you told us you were going out on leave for hemorrhoids.

(Id., at 206). According to the termination form, the following people participated in the termination decision: Frank Schwartz, Senior Operations Manager; Sean Falcone, Area Vice President; and Chad Whiting, Area Human Resources Manager. The form is signed and dated in August 2018. At the point of Buss' termination, Penske had not reached a decision regarding Buss' accommodation request regarding the absence of an inward-facing camera in the cab of the truck he would be expected to operate.

Buss filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") in June 2018, before his employment was terminated. The PHRC

complaint was not served on Penske until 2019. (Doc. 76, at 19) ("It is admitted that the original and amended [PHRC] complaints appear to have been served in 2019").

It is against this factual backdrop that Buss filed the instant suit against Penske on January 25, 2021. Buss brings claims of ADA discrimination (Count I), PHRA Discrimination (Count II), and a claim of retaliation under the ADA and PHRA (Count III). Penske filed the instant motion for summary judgment, arguing that these claims fail as a matter of law. (Doc. 72). The motion is fully briefed and ripe for resolution. (Docs. 73-4, 76-80). Penske argues that Buss has not established *prima facie* cases of discrimination or retaliation. Further in support of its motion, Penske argues it has articulated a legitimate, non-discriminatory and non-retaliatory reason for terminating Buss' employment and that Buss has not shown its reason be merely pretextual. After consideration, and for the following reasons, we recommend that Penske's motion for summary judgment be granted.

## III.   Discussion

### A.    Summary Judgment Standard of Review

Penske has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that

do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also

appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982); see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not

sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence, or assess credibility, when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. Id. Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Anderson, 477 U.S. at 252; see also Big Apple BMW, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its

opponent.  It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

It is against these legal benchmarks that we assess the instant motion for summary judgment.

###    B.    Penske's Motion for Summary Judgment Should Be Granted.

In the instant case, Penske moves for summary judgment contending that Buss has not made a *prima facie* showing of discrimination or retaliation. Moreover, Penske asserts that it had a legitimate, nondiscriminatory and nonretaliatory reason for terminating Buss' employment. Penske asserts that Buss' previously undisclosed prescription drug use and substance abuse treatment constituted terminable offenses under its Drug and Alcohol Policy. Penske also argues that Buss has not shown its reason for terminating Buss' employment and thus stopping the review of Buss' accommodation request was pretextual.

After consideration, we agree with Penske and therefore, we recommend that Penske's motion for summary judgment be granted.

1.  **ADA Discrimination**[2]

The purpose of the ADA is to "prevent employment discrimination of qualified individuals on account of their disability." Koller v. Riley Riper Hollin & Colagreco, 850 F. Supp. 2d 502, 512 (E.D. Pa. 2012) (citing 42 U.S.C. § 12112(a)). The ADA requires employers to make "reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability, unless the employer demonstrates that such accommodations would impose an undue hardship in the operation of their business." Id. (quoting Fleck v. WILMAC, Corp., 2011 WL 1899198, at *4 (E.D. Pa. May 19, 2011)) (internal quotations omitted).

In order to make out a *prima facie* claim for workplace discrimination under the ADA, a plaintiff must demonstrate that he is (1) disabled within the meaning of the ADA, (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, and (3) has suffered an adverse employment decision as a result of the discrimination. Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 185 (3d Cir. 2010); see also Stadtmiller v.

---

[2] Because "our analysis of an ADA claim applies equally to a PHRA claim," Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999), we will analyze Buss' ADA and PHRA claims together. See also Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 564 (3d Cir. 2002) (treating ADA and PHRA retaliation claims the same).

UPMC Health Plan, Inc., 491 F. App'x 334, 336 (3d Cir. 2012); Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998).

If the plaintiff makes a *prima facie* showing under this three-part standard, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. See Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (noting that the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to ADA disparate treatment and retaliation claims). If a legitimate, nondiscriminatory reason is given, then the plaintiff must present evidence to demonstrate that the defendant's reasons were pretext for its unlawful action. Id. The plaintiff may meet this burden by identifying evidence that allows a factfinder either to disbelieve the employer's articulated legitimate justification, or to conclude that an invidious discriminatory reason was more likely than not a "but for" cause of the employment action. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). This "but for" standard of causation sets an exacting benchmark for these claims.

In instant case, Buss presents his discrimination claim under two theories, a disparate treatment and failure to accommodate theory.

> Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities. The ADA specifies that an employer discriminates against a qualified individual with a disability when the employer does "not mak[e] reasonable accommodations to the known physical or mental

limitations of the individual unless the [employer] can demonstrate that
the accommodation would impose an undue hardship on the operation
of the business of the [employer]."

Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999) (quoting 42

U.S.C. § 12112(b)(5)(A)).

Turning first to Buss' claim that Penske failed to accommodate his request to

not have an inward facing camera installed in his truck, Penske contends that Buss

has not proven a *prima facie* case of discrimination. The parties do not dispute

whether Buss proved the first two elements of his *prima facie* failure to

accommodate claim but dispute the third element—whether Buss suffered an

adverse employment decision as a result of the discrimination.

Buss can satisfy this disputed third element of his failure to accommodate

claim by showing that Penske failed to engage in an interactive process. See Willis

v. Norristown Area Sch. Dist., 2 F. Supp. 3d 597, 606 (E.D. Pa. 2014). Penske argues

that it made a good faith effort to assist Buss and engaged in an interactive process

in response to Buss' request for an accommodation. Further, Penske explains the

alleged policy violations committed by Buss that were discovered during this

interactive process constitute the reason why Buss' employment was terminated, and

the review of his accommodation request was cut short. For his part, Buss minimizes

these undisputed efforts to address his concerns and argues Penske did not initiate

an interactive process but only took steps that were a precondition to initiating an

interactive process. (Doc. 76, at 9). We conclude for the reasons below that Penske engaged in an interactive process as required by the regulations and Buss has failed to establish the third element of his *prima facie* case.

The applicable regulations regarding engagement in an interactive process provide that "[o]nce a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. § 1630 App. 1630.9, at 359. The regulations also observe that "[t]he determination of which accommodation is appropriate in a particular situation involves a process in which the employer and employee identify the precise limitations imposed by the disability and explore potential accommodations that would overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

The duty to engage in a meaningful interactive process is a reciprocal responsibility. Both the employee and the employer must participate in this process in good faith. Mills v. Temple Univ., 869 F. Supp. 2d 609, 622 (E.D. Pa. 2012). In short, "both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith." Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 330 (3d Cir. 2003). In order for a plaintiff to hold an employer liable for a

breakdown in this mandatory interactive process, the plaintiff must show that (1) the employer knew about his disability; (2) he requested accommodations or assistance for this disability; (3) the employer did not make a good faith effort to assist him in seeking accommodations; and (4) he could have been reasonably accommodated but for his employer's lack of good faith. Id. at 330-31.

Furthermore, it is clear that the alleged inadequacy of an interactive process, standing alone, will not support an ADA claim. Quite the contrary, an alleged "failure to participate in the interactive process is not a ground for liability unless the employee has proven a failure to accommodate." Whelan v. Teledyne Metalworking Products, 226 F. App'x 141, 147 (3d Cir. 2007).

Buss argues that Penske did not engage in an interactive process stating: "About the only interactive process in which the parties participated was Penske's request that [Buss] provide some medical documentation about his condition. Plaintiff believes that this is not part of the interactive process but is rather a precondition to initializing the interactive process." (Doc. 76, at 9). Further, Buss states that after he produced the medical information, Penske did not initiate the interactive process. (Id.) Buss asserts that Penske's response to his accommodation request was to "stonewall it" and that what was done with the medical information he submitted to Penske "remains a mystery today." (Id., at 5).

In our view, Penske seeking medical documentation in response to an accommodation request is not a "precondition" to the interactive process. Rather, it is an integral part of that interactive process. Buss does not direct the court to any legal authority that draws a metaphysical line between what actions constitute engaging in an interactive process versus merely a precondition to engaging in an interactive process. Further, as Penske aptly noted in its reply brief, Buss ignores the fact that Penske then went further in this interactive process. It conducted an independent medical examination, which not only do we recognize as part of the interactive process, but the doctor's report from the independent medical examination revealed Buss was legally taking prescription drugs and not disclosing this fact to Penske.

We conclude that Buss has not shown that Penske failed to make a good faith effort to assist Buss in seeking an accommodation—the third element necessary to hold Penske liable for failing to engage in an interactive process. If Buss established that Penske failed to engage in an interactive process, he would have proved the third element necessary for a *prima facie* case of discrimination—suffered an adverse employment decision. But because Buss did not establish this, we conclude that Buss has not established a *prima facie* case of discrimination under the theory that Penske failed to accommodate his request.

In any event, even if we were to conclude Buss established a *prima facie* case of discrimination the burden would shift to Penske to proffer a legitimate nondiscriminatory reason for failing to accommodate Buss. Once Penske met that burden, it would still be entitled to a judgment in its favor. For the reasons discussed below, we conclude that Penske has met this burden.

Penske explains that during the interactive process to determine if there was a reasonable accommodation for Buss, it was revealed that Buss violated Penske's Drug and Alcohol Policy. (Doc. 74, at 14). Penske then terminated Buss' employment based upon this safety-related employment policy, eliminating the need to continue to review Buss' accommodation request. (Id.) Buss argues that Penske cannot establish a legitimate, non-discriminatory reason for failing to accommodate Buss because "[t]he termination decision was predicated on the wrong policy. Penske never identified any document or policy that established the 2015 duties of a hospitalized employee." (Doc. 76, at 19). Buss highlighted that on the bottom right corner of the policy there is a notation that the policy is effective as of January 16, 2017.

This contention fails, however, for a single, simple reason. The argument that Buss' termination was based on the wrong policy does not account for Buss' failure to disclose to Penske the prescription drugs he was taking between January 2017 to

his termination. The termination action form listed the following the reasons for

Buss's termination:

> During your recent medical examination we learned about the amount
> of drugs you are/were taking and required to report to us, but did not.
> Failure to report is a terminable offense and a violation of our drug and
> alcohol policy. In addition, we learned that you entered rehab for drug
> and alcohol use during your employment and did not disclose this to us
> either. In fact, you told us you were going out on leave for hemorrhoids.

(Doc. 76-2, at 55). Thus, the explanation of Buss' termination is not limited to Buss'

failure to disclose his inpatient substance abuse treatment he received in 2015. Buss

also admitted to taking several prescription drugs between 2015 to 2018, a fact which

was not disclosed to Penske. (Doc. 73-1, at 46-47). Therefore, from 2017, when Buss

noted Penske's Drug and Alcohol Policy became effective, until Buss was

terminated in 2018, he was taking undisclosed prescription drugs. A subsection of

Penske's Drug and Alcohol Policy entitled "Drugs – Illegal and Prescription" states:

> Associates in Safety-Sensitive Positions (e.g. including, but not limited
> to, anyone operating any equipment, tools, and/or vehicles, such as
> Drivers, Hikers, CSRs, Technicians, Forklift Drivers, etc.) undergoing
> prescribed medical treatment with a controlled substance *shall*
> *immediately report this information to Human Resources*. The
> Company must be aware of such treatment to effectively manage any
> safety and/or potential job performance concern(s). Failure to report the
> use of controlled substances as required above is grounds for
> disciplinary action, up to and including discharge.

(Doc. 76-1, at 106) (emphasis added).

Buss' failure to disclose the prescription drugs he was taking from 2017 until

his termination in 2018 was in clear violation of this portion of the policy, a violation

18

that carried with it the potential of termination. Therefore, we conclude that this violation, regardless of whether Buss' prior failure to disclose his drug and alcohol treatment in 2015 was also a violation, is a legitimate and nondiscriminatory reason for Buss' termination and ceasing the review of Penske's accommodation request.

Thus, Penske has satisfied its burden under <u>McDonnell Douglas</u> of establishing a legitimate, non-discriminatory reason for its actions. Because Penske has sufficiently articulated a legitimate, nondiscriminatory reason for failing to accommodate Buss, the burden shifts back to Buss to "show by a preponderance of the evidence that [the Defendant's] explanation is pretextual." <u>Fuentes</u>, 32 F.3d at 763.

Buss argues the reason for his termination was pretextual because of the time delay between Penske receiving the information it relied upon to terminate his employment and when his employment was terminated. Buss explained:

> Penske received the Janofsky report which allegedly made reference to the 2015 hospitalization. Penske took no action against Buss. Then, in August, someone decides Tom Buss should be terminated. **If Penske was serious about this, they would have terminated Tom immediately upon receipt of the Janofsky report. Instead, two months later someone decided to terminate him.**

(Doc. 76, at 14).

In response to Buss's argument, Penske explained that the delay was because Buss was on protected leave, and it waited until Buss was no longer on protected leave before terminating his employment. (Doc. 79, at 6-7). As there is a valid

explanation for this delay, in our view, Buss has not shown by a preponderance of evidence that Penske's reason for not accommodating his request was pretextual. Therefore, even if Buss could establish a *prima facie* case of discrimination, Buss has failed to rebut Penske's legitimate reason for his termination. Accordingly, this discrimination claim fails as a matter of law and should be dismissed.

Buss also alleged that Penske is liable under the ADA for disparate treatment because of his disability. "In order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.' " Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (quoting Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998)).

As we determined with respect to Buss' failure to accommodate claim, Buss cannot meet the third requirement of a *prima facie* case—that he suffered an otherwise adverse employment decision as a result of discrimination. As we have explained, Penske terminated Buss' employment because Buss violated the subsection of Penske's Alcohol and Drug Policy entitled "Drugs – Illegal and Prescription" by not disclosing the prescription drugs he was taking from January 2017 until his termination. Buss has not shown that his employment was terminated

because of an alleged disability as opposed to his violation of Penske's reporting policy.

Also as explained above, even if Buss could establish a *prima facie* case of discrimination under a disparate treatment theory, the claim should not survive summary judgment because Penske had a legitimate reason to terminate Buss's employment—Buss violated Penske's Drug and Alcohol Policy—and Buss has not established the reason was pretextual. Thus, Penske did not violate the ADA by discriminating against Buss nor by failing to accommodate Buss. Accordingly, we recommend that Penske's motion for summary judgment be granted with respect to Buss's ADA and PHRA claims asserted under the theories of disparate treatment and a failure to accommodate.[3]

### 2.   ADA Retaliation[4]

Buss further argues that Penske retaliated against him by terminating his employment in violation of the ADA and PHRA. We disagree. The ADA prohibits

---

[3] We note that we are not alone in reaching this conclusion. Quite the contrary, other courts have held that the termination of a truck driver for violating drug and alcohol safety-related protocols does not violate the ADA.  Jarvela v. Crete Carrier Corp., 776 F.3d 822, 831 (11th Cir. 2015); Larson v. United Nat. Foods W. Inc., 518 F. App'x 589, 591 (9th Cir. 2013); Mararri v. WCI Steel, Inc., 130 F.3d 1180, 1183 (6th Cir. 1997).

[4] Buss asserts retaliation under the ADA and the PHRA as one claim (Count III), and thus, we will analyze these claims together. (See n. 2, supra).

employers from retaliating against employees who oppose an act or practice made unlawful by the ADA or because the employee has made a charge under the ADA. 42 U.S.C. § 12203(a); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003) ("it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA."). Although requesting a reasonable accommodation does not appear to "fit[ ] within the literal language of the statute," Soileua v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997), the Court of Appeals has held that making a good-faith request for an accommodation is protected activity for purposes of the ADA's anti-retaliation provision. Shellenberger, 318 F.3d at 191.

In order to make out a *prima facie* case of illegal retaliation under the ADA, a plaintiff must show (1) protected employee activity, (2) adverse action by the employer either after or contemporaneous with the employee's protected activity, and (3) a causal relationship between the protected activity and the adverse action. Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 759 (3d Cir. 2004); Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002). The same McDonnell Douglas burden-shifting framework described above with respect to the ADA discrimination claims also applies to ADA retaliation claims. In all cases involving retaliation, a plaintiff must prove that retaliatory animus played a role in the employer's decision-making process and that it had a determinative

22

effect on the outcome of the process. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997). That burden always remains with the plaintiff. Id.

Turning to whether Buss has established a *prima facie* case of retaliation, the parties dispute whether the third element is satisfied. The third and final element of a retaliation claim—causation—is frequently the most hotly contested issue in these cases. "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. See Krouse, 126 F.3d at 503-04; Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997). In the absence of that proof, the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000); Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

On this score "[t]he mere fact that adverse employment action occurs after [a protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). However, the Third Circuit has also clarified that if the timing of the retaliatory

action is " 'unusually suggestive' of retaliatory motive" a causal link may be inferred. Krouse, 126 F.3d at 503 (citing Robinson, 120 F.3d at 1302). In some cases, the Court of Appeals has found a period of two days demonstrated a causal link, Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), but has found that a period of two months did not. See Williams, 380 F.3d at 760.

In the complaint Buss alleged that the termination of his employment was a "direct result of his indication that he sought the assistance of the Pennsylvania Human Relations Commission." (Doc. 1, at ¶ 43). Penske asserts that this is not possible because it did not learn of Buss' filing of a PHRC charge until more than one year after Buss' employment was terminated. (Doc. 74, at 11). Penske explains that:

> Buss testified, in unambiguous terms, that, other than his attorney and immediate family, he did not disclose to anybody that he filed a complaint with the PHRC in 2018. (SUMF at ¶ 59). And, Buss cannot present evidence that any of the individuals involved in the decision to terminate his employment (to whom Buss did not disclose his filing of a complaint) otherwise knew that Buss submitted a complaint to the PHRC in June 2018. To the contrary, the undisputed evidence shows that the individuals involved in the decision to terminate Buss's employment lacked knowledge of his charge.

(Id., at 12).

Buss argues that but for his pending request under the ADA, his discharge would not have occurred. (Doc. 76, at 12). Further, Buss asserts that summary judgment is inappropriate because there is a factual issue as to whether Penske knew

a PHRC complaint had been filed. (Id., at 13-14). However, Buss conceded the following: "It is admitted that the original and amended complaints appear to have been served in 2019." (Doc. 76, at 19). Therefore, it is undisputed that Penske was not served with the PHRC complaint until 2019. Further, we agree with Penske that Buss has not presented evidence that those who decided to terminate Buss for violating Penske's Drug and Alcohol Policy had knowledge of this PHRC complaint. Indeed, it defies logic that these individuals and Penske retaliated against Buss by terminating him for something that they only learned *after* his termination. Thus, Buss has not proven that retaliatory animus played a role in Penske's decision-making process such that it had a determinative effect.

On this score, we conclude that Buss has not established a *prima facie* case of retaliation because he has not demonstrated a causal link between the protected activity of filing a PHRC complaint and the termination of his employment. But, once again, even if Buss were to meet his burden of making out a *prima facie* case of retaliation, we would still recommend summary judgment be granted on this claim because, as we explained when discussing Buss' ADA discrimination claims, Buss' violation of Penske's policy is not only a legitimate nondiscriminatory reason for terminating Buss' employment but is also a legitimate nonretaliatory reason for taking this action. Buss has not offered evidence to demonstrate pretext other than the evidence he already offered in support of his discrimination claims which we

have found to be legally insufficient. Therefore, for the same reasons, Buss does not meet his burden under <u>McDonell Douglass</u>. Accordingly, even if Buss could establish a *prima facie* case of retaliation his claim should not survive summary judgment.

## IV.   <u>Recommendation</u>

Accordingly, for the foregoing reasons, it is RECOMMENDED that Penske's motion for summary judgment (Doc. 72) be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 7th day of March 2023.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge